UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY HARRISON #220488,

    Plaintiff,                                                 Hon. Robert J. Jonker

v.                                                                    Case No. 1:23-cv-764

JAMIE VANDERMOLEN, et al.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Jeffrey Harrison, a prisoner currently incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF), filed a complaint pursuant to 42 U.S.C. § 1983 on July 18, 2023, against several Defendants employed by the MDOC based on events that occurred at MCF in June 2022. Harrison's remaining claims in this action are his Eighth Amendment deliberate-indifference-to-medical-need claims against nurses Vera Poulin and Jamie VanderMolen.

Presently before me are: (1) Defendants Poulin and VanderMolen's Motion for Summary Judgment (ECF No. 57); and (2) Harrison's Motion for Sanctions. (ECF No. 75.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **GRANT** Defendants' motion for summary judgment, **DENY** Harrison's motion for sanctions, and dismiss the complaint **with prejudice**.

**I.    Background**

**A.    Harrison's Version**

Harrison alleges that on June 18, 2022, around 7:30 p.m., he began to feel ill due to bloating of his stomach/abdominal area and had severe pain in his abdomen. (ECF No. 1 at PageID.3.) Around the same time, he was experiencing constipation, nausea, chills, and vomiting. (*Id.*)

Harrison asked his cellmate, Terrance Williams #588573, along with prisoners Paul Clark #191098 and Derek Meyers #651167, to inform the officers in the unit of Harrison's condition. (*Id.*; ECF No. 64-1 at PageID.419.) Harrison remained in the cell while Williams and the other prisoners left to speak with the unit custody officers. (ECF No. 58-3 at PageID.309.)

About five minutes later, Corrections Officer (CO) Richard Zang went to Harrison's cell to check on him. Harrison claims that he informed CO Zang that his stomach was bloated, and he was having severe stomach/abdominal pain like his appendix was going to burst and that he was nauseated, vomiting, and having chills and needed to see a nurse. (ECF No. 1 at PageID.3; ECF No. 64-1 at PageID.419.) At this point, Harrison thought his symptoms might have been caused by food poisoning. (ECF No. 58-3 at PageID.310.) CO Zang told Harrison "to hold tight" while he contacted health services about Harrison's situation and proceeded to leave the cell. (ECF No. 1 at PageID.3; ECF No. 64-1.) Harrison claims that CO Zang returned to his cell about five-to-ten minutes later and told Harrison that had spoken with RN Poulin in health services, who told CO Zang that "[s]he was about to leave," and "couldn't help [Harrison] . . . [but] would contact Brooks Correctional Facility in regard to [his] illness." (ECF No. 58-3 at PageID.310–11.) Harrison also claims that CO Zang told him that RN Poulin said that another nurse, RN VanderMolen, at Brooks Correctional Facility (LRF) was notified because RN Poulin was leaving for the day. (ECF No. 1 at PageID.3.) Harrison asserts that CO Zang then left his cell, apparently to wait for a call from an LRF nurse. (ECF No. 58-3 at PageID.315.)

Harrison alleges that after CO Zang left, two other officers, COs VanDeusen and Stevens, checked on him at different times, and he told them he felt ill, reported his symptoms to them, and told them that he needed to see a nurse. (ECF No. 1 at PageID.3; ECF No. 64-1 at PageID.419–20.) Both officers told him that they would inform health services of his condition before they left

2

his cell. (*Id.* at PageID.420.) CO Zang eventually returned to Harrison's cell and informed Harrison that he had received a call from RN VanderMolen of LRF healthcare services. (*Id.* at PageID.420.) Harrison claims that CO Zang told him that he told RN VanderMolen that Harrison "was vomiting, constipated, nauseated, had chills, abdominal pain, and [was] real - - real ill, real sick, very sick." (ECF No. 58-3 at PageID.316.) CO Zang told Harrison that RN VanderMolen said that she was not going to see Harrison that night and that he should send health services a kite about the matter and that MCF health services would see him the next day. (*Id.*) Although CO Zang was holding a health services kite form at the time, Harrison told CO Zang that he was too ill to complete it. (ECF No. 58-3 at PageID.321; ECF No. 64-1 at PageID.420.)

The following day, June 19, 2022, at approximately 6:30 a.m., Harrison, assisted by other prisoners, went to the officer's desk and informed the morning shift officers, Larson and Caltagirone, that he was ill and described his symptoms. (ECF No. 1 at PageID.4; ECF No. 64-1 at PageID.420; ECF No. 64-4.) The officers contacted health services and had Harrison speak to RN Mitteer, who told Harrison that she would come over to see him. Harrison waited in the unit day room lying on a table for approximately two and a half hours. Sometime between 9:30 a.m. and 10:00 a.m., Harrison was taken by wheelchair to health services, where RN Mitteer examined him. (ECF No. 58-3 at PageID.58-3; ECF No. 64-1 at PageID.420.) After contacting "her superior," RN Mitteer sent Harrison out to the hospital. (ECF No. 58-3 at PageID.323; ECF No. 64-1 at PageID.420.)

Harrison was sent to Mercy Hospital and subsequently transferred to McLaren Hospital for an appendectomy after he was diagnosed with appendicitis. Following the surgery, Harrison was returned to MCF. (*Id.*) During a follow-up appointment on June 27, 2022, he reported "feeling a lot better since his surgery," and had "no complaints, [and] denie[d] any pain and nausea or

3

vomiting." (ECF No. 58-12.) On July 5, 2022, at his two-week post-surgery follow-up visit, there were no concerns with infection, such as drainage, erythema, or swelling. (ECF No. 58-13.)

### B. Defendants' Evidence

In support of their motion, Defendants Poulin and VanderMolen offer their affidavits/declarations, affidavits/declarations from COs Zang and VanDeusen, and Unit 2 logbook entries from June 18 and 19, 2022.

Two logbook entries from June 18, 2022, are relevant to Harrison's situation. The first entry at 9:37 p.m. (2137 hours), states, "Control Center called for Harrison #220488 for vomiting and light headed feeling." (ECF No. 58-6.) The second entry at 9:41 p.m. (2141 hours) states:

> Note: prisoner Harrison #220488 (2-205 B) requested to be seen by health service for chills, vomiting, and nausea. C/C notified and nurse to be contacted at Brooks Facility. Nurse VanderMolen called unit and instructed staff to have prisoner Harrison fill out a health care kite and submit it on Sunday 6/19/22 to MCF health service.

(*Id.*)

In her affidavit, RN Poulin states that she was on duty at MCF on June 18, 2022, and other healthcare personnel were working with her at MCF at that time. However, she does not recall speaking with CO Zang or any other MDOC personnel regarding Harrison's medical symptoms and does not recall being informed of any symptoms Harrison might have been experiencing. RN Poulin states that, had she known or believed that Harrison was suffering from appendicitis on June 18, 2022, she would have provided him medical treatment. RN Poulin also notes that because of the high volume of prisoners she sees as a nurse, she relies on medical notes that she creates for prisoners who request medical care. She confirms that Harrison's MDOC medical file contains no notes indicating that she was aware of Harrison's need for medical care on June 18, 2022. (ECF No. 58-4 at PageID.330.)

4

CO Zang states that on June 18, 2022, while he was working in MCF Housing Unit 2, Harrison informed him that he was experiencing medical symptoms including chills, vomiting, and nausea and requested medical care. Zang states that in response to the request, he contacted the MCF control center to request medical care for Harrison and was told that LRF's healthcare services would be contacted because at that point MCF nursing staff was no longer on-site at the facility. Zang does not recall speaking to RN Poulin that night, nor does he recall telling Harrison that he had spoken with RN Poulin. Finally, Zang confirms that he wrote the note in the Unit 2 logbook set forth above at 9:41 p.m. and that his logbook entry accurately recorded the symptoms Harrison had reported to him. (ECF No. 58-5 at PageID.334.)

CO VanDeusen states that he was working in MCF Unit 2 on June 18, 2022, where Harrison was housed. He further states that he reviewed the Unit 2 logbook entries from June 18, 2022, and confirms that he wrote the entry in the logbook at 9:37 p.m. and that he contacted the MCF control center to request medical care for Harrison. He also confirms that his entry was accurate as to the symptoms that had been reported to him. (ECF No. 58-7 at PageID.341.)

RN VanderMolen states that she was employed as a registered nurse at LRF but also performed duties on an "as-needed basis" for MCF. She confirms that she was on duty at LRF on June 18, 2022, when she was notified that Harrison had requested medial care. She called CO Zang at MCF Unit 2, where Harrison was housed. Based on her discussion with CO Zang, she believed that Harrison's symptoms were consistent with a routine condition, such as influenza or food poisoning, that did not require immediate medical attention as set forth in MDOC Policy Directive 03.04.100. Instead, she believed that Harrison's symptoms that CO Zang had reported to her could be addressed the following day without any risk to Harrison's health through a medical kite to MCF. VanderMolen states that, while speaking with CO Zang, it did not occur to her that Harrison

5

could potentially be suffering from appendicitis, but had she known that he was suffering from that condition, she would have provided him medical care consistent with MDOC policies and procedures. (ECF No. 58-9 at PageID.358.)

Finally, Defendants note the entry by CO Zang in the Unit 2 logbook on June 19, 2022, at 6:00 p.m. (1800 hours) stating, "Note: prisoner Harrison #220488 (205-B) currently out to hospital for nausea, vomiting, and chills." (ECF No. 58-10.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.  Discussion

### A.  Defendants' Motion

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations that occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Punishment that is without penological justification or involves the unnecessary and wanton infliction of pain also violates the Eighth Amendment's

6

proscriptions. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). In other words, the Eighth Amendment prohibits "the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The unnecessary and wanton infliction of pain encompasses "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001). Determining whether denial of medical care amounts to an Eighth Amendment violation involves two steps. First, the court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need" sufficient to implicate the Eighth Amendment is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Thus, the objective component is satisfied where a prisoner receives no treatment for a serious medical need. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier*, 238 F.3d at 742 (internal quotation marks omitted).

If the plaintiff satisfies the objective component, he must then demonstrate that the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that

7

risk by failing to take reasonable measures to abate it.'" *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847). To satisfy this part of the analysis, the plaintiff must demonstrate that the defendant acted with "deliberateness tantamount to intent to punish." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).

For purposes of their motion, Defendants concede that Harrison's diagnosed appendicitis was a serious medical condition requiring treatment that satisfies the objective prong of his deliberate-indifference claim. They argue, however, that Harrison cannot establish the subjective component. To do this, Harrison "must present evidence from which a trier of fact could conclude 'that [Defendants Poulin and VanderMolen] w[ere] subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Greene*, 361 F.3d at 294 (quoting *Farmer*, 511 U.S. at 829, 847).

Defendants contend that Harrison has no admissible evidence to support his claims. First, as to RN Poulin, they argue that, contrary to Harrison's alleged conversation with CO Zang in which Zang allegedly told Harrison that he had spoken with RN Poulin and she refused to provide Harrison medical care because she was "leaving for the day" (ECF No. 1 at PageID.3), RN Poulin states that she does not recall speaking with CO Zang or any other MDOC employee regarding Harrison's symptoms on June 18, 2022. Defendants further note that there is no evidence in Harrison's MDOC medical file showing that RN Poulin was informed of Harrison's request for medical care. Finally, they note that CO Zang does not recall speaking with RN Poulin on June 18, 2022, regarding Harrison's symptoms. Instead, he contacted the MCF control center and was told that a nurse from LRF healthcare would be contacted because MCF nursing was no longer on site. Defendants also point out that Zang's affidavit is consistent with the logbook entry he made on June 18, 2022. (ECF No. 58 at PageID.296–97.)

As to RN VanderMolen, Defendants concede that Zang spoke to her in the evening on June 18, 2022, but they note that RN VanderMolen confirms that the information Zang provided did not suggest that Harrison's symptoms required immediate attention. Rather, she believed they were consistent with common illnesses, such as influenza or food poisoning, that could be addressed the following day through submission of a medical kite to MCF health services staff. (ECF No. 58-9 at PageID.358.) As further support, Defendants note that the logbook entries indicate that the information CO Zang passed on regarding Harrison's complaints was limited to vomiting, chills, and nausea and that the information CO VanDeusen had received was that Harrison was vomiting and light-headed. (ECF No. 58 at PageID.298–99.) Defendants contend that based on this information, RN VanderMolen reasonably believed that Harrison did not need immediate medical attention. (*Id.* at PageID.299.)

In response, Harrison points to CO Zang's alleged statements to Harrison when CO Zang returned to Harrison's cell, first, after allegedly speaking with RN Poulin, and a second time, after speaking with RN VanderMolen at LRF. As to the former statement, Harrison concedes that he has no first-hand knowledge as to whether CO Zang actually spoke to RN Poulin or what was said during the alleged conversation. (ECF No. 58-3 at PageID.310–11.) Similarly, Harrison concedes that he has no first-hand knowledge as to what information CO Zang told RN VanDeusen about Harrison's symptoms. (*Id.* at PageID.316.)

Recognizing that CO Zang's statements are hearsay, Harrison contends that they are admissible as an excited utterance and/or as statements made for medical diagnosis for treatment under Federal Rule of Evidence 803(2) and 803(4). Neither exception applies.

9

First CO Zang's alleged statements do not qualify for admission under Rule 803(4) because the circumstances do not fit the exception. As set forth in *Field v. Trigg County Hospital, Inc.*, 386 F.3d 729 (6th Cir. 2004):

> The rationale behind this exception is that statements made by an individual to physicians for purposes of diagnosis or treatment are considered exceptionally trustworthy because the declarant has a strong motive to tell the truth in order to receive proper care. *White v. Illinois*, 502 U.S. 346, 355–56, 112 S. Ct. 736, 116 L.Ed.2d 848 (1992). As such, courts have interpreted the exception to be limited to statements made by the one actually seeking medical treatment or care. *See Stull v. Fuqua Inds., Inc.*, 906 F.2d 1271, 1273–74 (8th Cir. 1990) ("[T]o fall within the exception [of Fed. R. Evid. 803(4) ], the statement must be obtained from the person seeking treatment, or in some instances from someone with a special relationship to the person seeking treatment, such as a parent."); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) ("Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse."); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) (holding that statements made by a doctor to a patient are not admissible under Fed. R. Evid. 803(4) because the rule does not except statements by the person providing medical care). We agree that the hearsay exception set forth in Fed. R. Evid. 803(4) applies only to statements made by the one actually seeking or receiving medical treatment. Accordingly, the Vanderbilt physicians' statements—as statements made by consulting physicians to the treating physician—are not admissible pursuant to the Fed. R. Evid. 803(4) hearsay exception.

*Id.* at 735–36. Harrison's reliance on Rule 803(4) is misplaced not only because CO Zang was not the person seeking medical treatment, but also because Zang made the alleged statements to Harrison—not to a medical professional for purposes of obtaining a medical diagnosis or treatment.

The statements also do not qualify as an excited utterance under Rule 803(2). An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The . . . exception is based on the belief that the statement is reliable because it is made while the declarant is under the stress of excitement." *United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (quoting *Haggins v.*

10

*Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)). This exception requires that:

> 1) there be an event startling enough to cause nervous excitement; 2) the statement be made before there is an opportunity to contrive or misrepresent; and 3) the statement be made while the person in [sic] under the stress of the excitement caused by the event.

*United States v. Beverly*, 369 F.3d 516, (6th Cir. 2004) (citing *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983)). Harrison asserts that CO Zang's observations of, and communications with, Harrison at his cell and recognition that Harrison had a serious medical need was startling enough to cause Zang to experience nervous excitement. (ECF No. 64 at PageID.404–05.) This argument lacks merit. At the time of the incident, CO Zang had been employed by the MDOC for seven years and had been trained in custody matters such as requesting medical care from MDOC health services on behalf of prisoners confined with the MDOC. (ECF No. 58-5 at PageID.333.) Nothing about the circumstances Harrison describes in his complaint and affidavit suggests that they were anything more than routine for CO Zang, *i.e.*, a prisoner reporting illness and requesting medical care. If, in fact, CO Zang's conduct or demeanor suggested he was acting under nervous excitement or stress while dealing with Harrison, Harrison failed to describe those circumstances in his affidavit, which is fatal to his argument that CO Zang's statements constituted an excited utterance under Rule 803(2).[1] Thus, Harrison cannot establish the first and third requirements of the exception. He has no admissible evidence to prove his claims against Defendants Poulin and VanderMolen.

---

[1] Harrison also relies on affidavits from prisoner Williams, his cellmate, and prisoners Myers and Clark, who went to the officer's desk with Williams to report Harrison's symptoms. (ECF Nos. 64-2, 64-3, and 64-4.) None of these affidavits creates a genuine issue of material fact as to whether CO Zang actually spoke to RN Poulin or what CO Zang actually said to RN Poulin or RN VanderMolen.

Next, Harrison argues that CO Zang's statements in his affidavit that he has "been trained in custody matters, including notifying and requesting medical services from MDOC healthcare on behalf of prisoners confined within the MDOC, consistent with MDOC policies and procedures," and has "been trained to accurately record prisoner requests for healthcare services," proves that he spoke to RN Poulin. Harrison reasons this must be true because MDOC Policy Directive 03.04.100, ¶ XX states that, when a prisoner notifies a staff member of his need for immediate medical care, the "staff person shall contact health care services and convey the prisoner's request, regardless of the prisoner's custody status or the time or day of the request," and "document all contacts with Health Care in the appropriate assignment logbook. . . ." (ECF No. 64 at PageID.406.) But this is argument, not evidence, which does not suffice to rebut Defendants' motion for summary judgment. As noted above, the only admissible evidence of record shows that Zang contacted the control center, which is unremarkable, as Policy Directive 03.04.100 ¶ WW provides that "[o]n-duty Health Care staff shall ensure that the facility's Control Center is aware of how to contact them at all times." Moreover, Harrison's own argument supports that CO Zang accurately recorded the symptoms Harrison described in his June 18, 2022 logbook entry.

Harrison also contends that a genuine issue of material fact remains as to whether RN Poulin was still on-site at MCF at the time he made his first request to CO Zang for medical care because RN Poulin admits in her affidavit that she worked at MCF on June 18, 2022, along with other healthcare personnel, and the Unit 2 logbook page Defendant Poulin produced during discovery shows that at 9:08 p.m. (2108), a prisoner was "taken by multiple nurses and yard staff into health services" and that at 9:41 p.m. the same prisoner was "returned to unit from health service." (*Id.* at PageID.406 (citing ECF No. 64-8 at PageID.465).) Harrison claims that these facts

12

are "significant" because they show that RN Poulin "was on site at MCF until 10:00 p.m. . . . and that officer Zang did in fact talk to her about Plaintiff's health care request . . . ." (*Id.* at PageID.407.)

These facts do not demonstrate what Harrison claims, but the issue for summary judgment purposes is not whether RN Poulin was still at MCF at the time Harrison requested medical care, but whether she was aware of his request. Harrison's argument that CO Zang must have spoken to RN Poulin because she was still at MCF is simply that: argument, not evidence. In the realm of possibilities, RN Poulin could still have been at MCF but unaware of Harrison's need for medical care because she had not spoken to CO Zang. Harrison fails to present evidence making this connection between the two, and the evidence of record refutes it.

Harrison also suggests that Defendants' act of blacking-out the information regarding another prisoner being taken from Unit 2 to healthcare at 9:08 p.m. on the logbook page they submitted as an exhibit to their summary judgment brief somehow suggests an intent to hide this information from the Court. (*Id.*) I find nothing nefarious about the form of Defendants' exhibit. The blacked-out information did not mention RN Poulin, RN VanderMolen, or Harrison; the incident occurred approximately 30 minutes before the first documented reference to Harrison's need for medical care; and the information does not show that RN Poulin spoke to CO Zang. In other words, it is immaterial to the pertinent issue. Moreover, given that Harrison had a non-blacked out copy of the logbook page containing the blacked-out information, blacking-out that immaterial information on the exhibit to hide it from the Court would have made no sense.

Turning to RN VanderMolen, Harrison cites several out-of-circuit cases for the proposition that the Eighth Amendment required VanderMolen to speak with him personally or examine him rather than relying on what CO Zang told her about Harrison's symptoms. Contrary to Harrison's

13

assertion, those cases do not hold that as a matter of law a medical provider may not rely on an officer's statements about a prisoner's symptoms. For example, *Hoptowit v. Ray*, 682 F.2d 1237, 1252 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995), concerned a host of alleged unconstitutional conditions at a state prison, and the portion of the opinion Harrison cites addressed the district court's findings concerning medical care at the penitentiary generally, not whether an individual defendant was deliberately indifferent to a particular plaintiff's need for medical care. *Id.* at 1252–53. Similarly, the language Harrison quotes from *Andrews v. Camden County*, 95 F. Supp. 2d 217 (D.N.J. 2000), pertained to the court's *Monell* liability analysis rather than individual liability. *Id.* at 228–33. Moreover, the court's actual statement was that the prison's "lack of a Medical Director and abandonment of the daily sick call system created an unreasonable risk that inmates would be deprived of their right to constitutionally adequate health care." *Id.* at 233. Those circumstances are not present here. And, as set forth above, the test for the subjective component applicable to this case is whether Defendants were aware of facts from which they could have drawn an inference of a substantial risk of serious harm to Harrison, and they must have also drawn the inference. *Farmer*, 511 U.S. at 837. Harrison has not presented evidence to make this showing.[2]

Harrison next contends that VanderMolen failed to comply with MDOC Policy Directive 03.04.100 ¶ XX by relying on the information CO Zang gave her instead speaking with Harrison herself, calling Harrison to health services, going to see Harrison at his cell at MCF, or sending

---

[2] The language that Harrison quotes from *Boswell v. County of Sherburne*, 849 F.2d 1117 (8th Cir. 1988), "Most prominent among Boswell's allegations is that inadequately trained jailers were directed to use their own judgment about the seriousness of prisoners' medical needs, rather than being directed to consult trained medical personnel," is inapplicable here as RN VanderMolen used her own judgment based on the information CO Zang provided to determine whether Harrison required emergent care.

him to the nearest emergency department. (ECF No. 64 at PageID.412.) As previously discussed, however, based on the information CO Zang provided—that Harrison was experiencing chills, vomiting, and nausea (ECF No. 58-6)—RN VanderMolen determined that Harrison appeared to be suffering from a routine condition that could be resolved the following day without risk of harm to Harrison pursuant to a request to MCF health services under Policy Directive 03.04.10 ¶¶ TT–VV. Harrison fails to show that RN VanderMolen perceived and disregarded a substantial risk of harm to Harrison. Finally, whether RN VanderMolen acted contrary to MDOC policy is not determinative of her liability on Harrison's Eighth Amendment claims, as claims under Section 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).

Last, Harrison contends that RN VanderMolen's declaration contradicts her answers to his discovery requests because in her declaration, she claims that she spoke with CO Zang about Harrison's medical condition on June 18, 2022, while in her discovery responses she denied speaking with Zang about Harrison's condition on that date. This is inaccurate. Harrison framed his discovery requests by specifically asking VanderMolen whether she spoke with CO Zang "at about 8:30 pm." (ECF No. 64-9 at PageID.471–72.) VanderMolen did not deny speaking with Zang on June 18, 2022. Rather, she objected to the time frame of "at about 8:30pm" as "vague and ambiguous" and answered that she did not call or speak with CO Zang "at 8:30P.M. on June 18, 2022 . . . ." (*Id.* at PageID.472.) RN VanderMolen actually spoke to Zang more than an hour later, around 9:41 p.m. While Harrison could have filed a motion to compel and reasonably argued that

15

RN VanderMolen was playing games with her answer, he failed to do so. In any event, this is not a basis to deny her motion for summary judgment.

### B. Motion for Sanctions

Harrison moves for a sanction of $50,000 pursuant to Federal Rules of Civil Procedure 11(c)(2) and 56(h) against Defendants Poulin and VanderMolen and their counsel. He contends that sanctions are warranted because: (1) Defendant Poulin and her counsel submitted an affidavit maintaining that she never spoke to CO Zang regarding Harrison's medical condition on June 18, 2022, and submitted an affidavit from CO Zang confirming the same thing because MCF medical staff had left for the day, while blacking-out information from the Unit 2 logbook page showing that nurses were on site at MCF in an attempt to mislead the Court that Zang and Poulin could not have possibly spoken; (2) Defendant VanderMolen and her counsel submitted a declaration stating that she spoke with CO Zang on June 18, 2022, regarding Harrison's condition, when she denied ever speaking with Zang on that date in her answers to Harrison's discovery requests; and (3) as retaliation, Defendants and their counsel submitted affidavits from Sgt. Larsen and Sgt. Caltagirone with their reply denying that they authored or executed statements that Harrison submitted with his summary judgment response. (ECF No. 75 at PageID.533–35.)

As an initial matter, Harrison cannot rely on Rule 11 for an award of sanctions because there is no indication in the docket report that he previously complied with the safe harbor provisions of Rule 11(c)(2), which requires that a party seeking sanctions under Rule 11(c) first serve its motion on the opposing party before filing it and provide 21 days to withdraw the challenged pleading or paper. Fed. R. Civ. P. 11(c)(2). Rule 56(h), the remaining authority, provides for an order awarding the opposing party's reasonable expenses incurred as a result of a party's submission of an affidavit or declaration in bad faith. Fed. R. Civ. P. 56(h).

I find no basis for an award under Rule 56(h) or Rule 11(c) for that matter. First, Harrison fails to demonstrate that Defendant Poulin's affidavit violated any rule. Defendants had a legitimate reason for blacking-out portions of the logbook page and, as already explained, did not hide relevant evidence or mislead the Court by doing so. Second, as I have already found, Defendant VanderMolen's declaration did not contradict her answers to Harrison's discovery requests. Finally, I dealt with the issue of the Larsen and Caltagirone declarations in my June 11, 2025 Order denying Harrison's request to file a sur-reply. (ECF No. 82.) As set forth in that order, whether Larsen and Caltagirone actually signed the statements Harrison submitted is immaterial to the remaining issues in the case because the disputed statements concern events that occurred in the morning of June 19, 2022, which are not at issue. Thus, the statements and the subsequent declarations Defendants submitted in their reply could not have prejudiced Harrison in any way. Therefore, Harrison's motion is properly denied.

## IV.   Conclusion

For the foregoing reasons, I recommend that the Court **GRANT** Defendants' Motion for Summary Judgment (ECF No. 57), **DENY** Harrison's Motion for Sanctions (ECF No. 75), and **dismiss** the remaining claims **with prejudice**.

Dated: August 25, 2025               /s/ Sally J. Berens
                                     SALLY J. BERENS
                                     U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).